# THE DEADWOOD-OSAGE OIL COMPANY v. J. W. WALKER

(No. 1821; January 9, 1934; 28 Pac. (2d) 482)

The cause was submitted for the defendants and appellants on the brief of *John P. Rusk* of Newcastle, Wyoming.

430

The cause was submitted for the plaintiff and respondent on the brief of *E. E. Wakeman,* of Newcastle, Wyoming.

RINER, Justice:

This case is brought here by direct appeal to review a judgment of the District Court of Weston County. The parties will for convenience be referred to as they were designated in the court below.

The facts involved in this litigation and material to be considered here are substantially as follows:

On March 23, 1922, the Department of the Interior of the United States, through its proper officers, granted to seven persons an oil and gas prospecting permit for a period of two years from the date thereof, under section 19 of an act of Congress, approved February 25, 1920, and generally known as the "Leasing Act," relative to public lands of the nation containing oil, gas, sodium, phosphate, etc. This permit authorized the grantees, under the law aforesaid, the terms of the grant, and the regulations of the Secretary of the Interior, to prospect for oil and gas upon certain lands in Weston County, Wyoming, described as the South Half of the Northwest Quarter and the North Half of the Southwest Quarter of Section 7, Township 46 North, Range 63 West, of the 6th P. M. By appropriate instruments of transfer, the plaintiff became the owner of this permit which, through sundry subsequent applications made for the purpose, was from time to time, extended.

Under date of June 25, 1929, plaintiff entered into an agreement with one B. V. Hole, relative to the North Half of the Southwest Quarter of Section 7, aforesaid, whereby it delivered to him possession of this land and the exclusive right to mine and operate thereon for oil and gas, he agreeing to do so in accordance with the requirements of the above mentioned permit, and to comply fully with all the re-

quirements of the United States, under it. He also agreed to pay specified royalties on production, both to the United States and to the plaintiff. Failure on the part of Hole to keep the several covenants incumbent upon him, at plaintiff's option and on 30 days notice, as provided by the agreement, should "terminate this contract and render the same inoperative, and not further binding upon" the plaintiff, "unless such defect shall be cured within said 30 days."

The possession of the South Half of the Northwest Quarter of Section 7 was, on October 14, 1929, by a contract of that date, also delivered to the said Hole by the plaintiff for a period of one year "and for as long thereafter as oil and gas may be produced therefrom," this agreement, in like manner as the preceding one, obligating him to operate on the premises as required by the permit aforesaid and by the United States thereunder. This contract also contained similar royalty and termination clauses as those already described above.

On June 25, 1929, the plaintiff leased to one J. W. Walker, "for the sole purpose of drilling and operating for oil, gas, and minerals," the Southwest Quarter of the Northeast Quarter of said Section 7, for the term of "one year from and after the date hereof and so long thereafter as oil, gas, and minerals are being found thereon and produced therefrom." This lease recited that there was already one producing well on the premises, and Walker, under its terms, agreed, following the execution of said lease, promptly to drill this well additionally, as might be necessary to improve its production, and also, within 60 days after signature of the contract, to "start drilling another well on said premises, and continue such work until the producing sands are reached, and thereafter will drill and complete as many wells in addition to those already stated, as good business conditions and

interests of the parties hereto will justify." The lease provided, also, that Walker should pay plaintiff a specified royalty on production, and finally, that default on his part in any of the obligations imposed should "work an immediate termination of this agreement," and that all his rights thereunder should "thereupon at once cease and be at an end."

Thereafter and prior to June, 1931, the defendants succeeded to the rights of Hole and Walker under these agreements, the party last mentioned being placed in charge of operations upon these lands on behalf of all of said defendants.

It appears that, acting under the contracts aforesaid, the defendants or their predecessors in interest, on July 1, 1929, commenced the drilling of a well on the Southeast Quarter of the Northwest Quarter of said Section 7, which was completed August 15, 1929, at a total depth of 855 feet, with the result that oil was discovered in such quantity that, if pumped steadily, the well would make an average of at least nine barrels of oil daily. Upon due application being made by the plaintiff to the Secretary of the Interior, a lease was given plaintiff under date of August 9, 1930, on the lands covered by the prospecting permit aforesaid. This lease recited that it was made subject to the terms of the Act of Congress heretofore mentioned and, among other things, provided for the payment of stipulated royalties on all oil and gas produced from the lands, and required the plaintiff, as lessee, "to maintain in a state of production, wells equal in number to the number of the now existing producing wells on the leased land, until the oil deposits are exhausted or until the proven territory has been drilled," specific provision being made for additionally drilling of producing wells "which, with any producing wells now on the land, equal in number the number of 40-acre tracts or lots embraced in the leased

premises, unless the lessor shall for any reason deemed sufficient consent in writing to the drilling of a less number of wells."

The proofs made on the trial of the case disclose that this well, on the Southeast Quarter of the Northwest Quarter of said Section 7, was pumped, production taken therefrom, and royalties paid thereon, as provided by the agreements aforesaid, in the months of August, September, October, and November during the year 1930. From that time onward, nothing was done either to produce oil or to increase production on any of the land embraced in the Government lease, up to June 4, 1931. So far as the land included in the Southwest Quarter of the Northeast Quarter of said Section 7 is concerned, there is evidence in the record that no oil was ever produced from it by the defendants after the execution of the agreement relating to it as aforesaid, and that the existing well on the land was not put in condition to produce oil. It is undisputed, also, as we understand the record, that no additional well was drilled on this 40-acre tract by the defendants, as required by the written contract hereinabove previously described. This particular piece of land was, it seems, held by plaintiff under the Oil Placer Mining Laws of the United States relating to the public lands of the nation.

On June 4, 1931, the plaintiff, by its secretary, sent through the mails a letter to J. W. Walker, the managing agent of the defendants, in charge of production operations on these lands, as we have said, wherein the writer directs the attention of his correspondent in substance to the fact that the United States Geological Survey office at Casper, Wyoming, has written plaintiff stating that there has been no production under the departmental lease, aforesaid, for several months past. After referring to the fact that

previous letters addressed to Walker have been unacknowledged and unanswered, the letter continued:

"We are inclined to deduce from this fact and your neglect of obligations to us and the government that you have lost interest. This is intended to merely confirm notices you have heretofore had and to advise you that unless you forthwith,—within reasonable time for communication by mail—following receipt of this letter, satisfy us that you are prepared to and will fulfill terms of your agreement with us, we will revoke your appointment to represent us in dealing with the government, will take possession of the land, and operate it ourselves. You will govern yourself accordingly."

No response appears to have been made to this communication and, nothing being done by the defendant to fulfill the obligations imposed on them by the several agreements described above, the latter part of July or the first part of August, 1931, the plaintiff took possession of all the lands involved and posted notices on them to that effect. On November 3, 1931, plaintiff brought suit to quiet its title both to the lands leased to it by the United States and the 40 acres included in the oil placer mining location described above.

The defendants in this suit, other than those making default, answered claiming an interest in the premises aforesaid, by virtue of the contracts outlined above and the drilling and development work performed under them, and asserted that they were, at the commencement of the suit, in possession of these lands, "developing, drilling, and operating the same for oil and gas," and that, at all times, "the defendants have fully complied with and fully performed all the requirements, terms, and conditions" of said agreements. Plaintiff filed its reply putting in issue these allegations and asserting a violation by

the defendants of the obligations imposed on them by said agreements, through failing to produce oil or gas from the premises, in neglecting to drill thereon as required, and in not paying the contemplated royalties.

The case was tried to the court without the intervention of a jury, with the result that a general finding was made in favor of the plaintiff and its title and possession decreed to be quieted, as against the answering defendants.

As we have observed, there is evidence in the record to the effect that from and including the month of December, 1930, to the latter part of July or the first of August, 1931, a period of about eight months, when plaintiff reentered and took possession of the premises affected by the several agreements of the parties, no production or enlargement of production, of either oil or gas, was undertaken by defendants to any extent, notwithstanding the specific requirements of the instruments under which they held their interest therein. This condition was allowed by them to prevail, too, for more than a month after a written demand had been transmitted to the managing agent of the defendants, in charge of production, urging that the defendants perform the obligations they had assumed.

It is generally true that agreements and leases for the exploration and development of minerals are executed by the lessor or the party contracting for work of this character with the definite understanding, either express or implied, that the land covered by the lease or contract shall, in fact, be explored and developed for minerals. Obviously, it would be unjust and unreasonable and a violation of both the nature and the spirit of such agreements, to allow the party who undertakes to perform work of this kind upon the land, to continue to hold it any considerable

period of time without any endeavor at all, on his part, to develop it according to the express or implied purpose of his obligation. While it is true that equity abhors a forfeiture, yet when the forfeiture produces an equitable result, harmonizes with the express or implied provisions of the agreement of the parties, and is conducive to public and private interest in the development of minerals in land, it should and will be allowed. This principle is especially applicable to agreements dealing with the exploration for and production of oil and gas, on account of the elusive character of these substances.

As remarked by the Court of Appeals of Kentucky in Monarch Oil, Gas & Coal Co. v. Richardson, 124 Ky. 602, 99 S. W. 669:

"It is true, as said by counsel for appellant, that forfeitures are not generally favored by the law, but forfeitures which arise in gas and oil leases by reason of the neglect of the lessee to develop or operate the leased premises are rather favored because of the peculiar character of the product to be produced. Hence it has been found necessary to guard the rights of the landowner as well as public interest by numerous covenants, some of the most stringent kind, to prevent their land from being burdened by unexecuted and profitless leases incompatible with the right of alienation and the use of the land. Forfeiture for nondevelopment or delay is essential to private and public interest in relation to the use and alienation of property. Perhaps in no other business is prompt performance of contracts so essential to the rights of the parties, or delay by one party likely to prove so injurious to the other. Thornton on the Law Relating to Oil and Gas, § 148; Brown v. Vandergrift, 80 Pa. 142."

See, also, Stephenson et al. v. Stitz et ux., 255 S. W. (Tex. Civ. App.) 812; 18 R. C. L. 1214, § 115.

The agreements in the case at bar, as we under-

stand them, expressly contemplate the active development of the premises and the prompt production of oil or gas therefrom. The consequences of a failure to comply with such requirements are well illustrated in the cases to which reference will now be made. Many others might be cited.

In Habermel, Trustee, v. Mong, 31 Fed. (2d) 822, 67 A. L. R. 216, the Circuit Court of Appeals for the Sixth Circuit had before it a case where, notwithstanding the lessee in an oil and gas lease had agreed to begin drilling operations in 60 days and to complete the same within a reasonable time thereafter, no action was taken by him for more than four months and, despite a warning to proceed as he had agreed, had, nevertheless, failed to indicate any sincere intention to begin development of the land involved. Affirming a decree of forfeiture of the lease against him, the court said, in the course of its discussion of the principles considered as governing the matter:

"Regardless of whether or not, and, if so, when, a gas and oil lease creates a' vested interest in the lessee, it is clear from the foregoing cases that, at least when the parties have not fully recovered the subject of delay by rental provisions, the lessee's rights terminate upon nonperformance of the condition that he develop the property promptly, a condition deemed implicit in every gas and oil lease—whether or not expressly set forth therein and reinforced by a forfeiture clause—because only in this way can the lessor secure protection and his share of the profits."

In Monarch Oil & Gas Co. v. Hunt, 193 Ky. 315, 235 S. W. 772, several oil wells had been completed by the lessee on the leased premises. It did not satisfactorily appear that these wells were of sufficient oil producing capacity to pay to operate them. Nothing more was done by the lessee to develop the leased

premises or produce oil or gas therefrom for about a year. Affirming a decree cancelling the lease, the court, as it seems to us, very appropriately said:

"Although two wells were drilled, no oil was produced or royalties or rentals paid. This was a violation of the spirit and terms of the lease contract which contemplated the payment of rentals or royalties so long as the lessee continued to hold the premises.

"An oil well from which no oil is produced is, as to the lessor waiting for royalties, as no well at all. The lease is a cloud upon his title—a burden upon the estate. Such a contract must be mutual and be supported by a sufficient consideration. If after drilling a well in which there is oil or gas the lessee goes away and leaves it for an unreasonable time without an effort to further develop the lease or market the oil, it will amount to an abandonment of the lease unless the lease is kept in force by the payment of rentals or in some other way, and a court of equity will relieve the lessor from the contract and cancel it. Soaper et al v. King et al, 167 Ky. 121, 180 S. W. 46."

Where a decree had been entered below cancelling an oil and gas lease for failure to produce oil from the leased land, the Supreme Court of Kansas, in Warner v. Kulp, 114 Kan. 118, 217 P. 288, filed an opinion affirming this conclusion of the trial court and, in part, said:

"The duration of the lease was fixed by a clause reading: 'It is agreed that this lease shall remain in force for a term of three years from May 15, 1918, and as long thereafter as oil or gas or either of them is produced from said land by the lessee.'

"The three years had expired, and the evidence warranted a finding, which the trial court must be deemed to have made, that the owners of the lease had voluntarily ceased production for a period of at

least three months. Inasmuch as, after the expiration of the three years, the lease by its express terms was to last only as long as oil or gas was produced from the land by the lessees, a judgment declaring it at an end was justified by the cessation of production."

The case of United States v. Brown, 15 Fed. (2d) 565, was one for an injunction and to quiet title, by the United States, to certain lands claimed by the defendant, as lessee under an oil and gas lease. Holding that a failure of the lessee, under such lease, to undertake development, after disconnecting a gas well, for some ten months, was unreasonable and sufficient to terminate the lease, conditioned on the production of oil or gas in paying quantities, the district judge stated, in the course of disposing of the case:

"I am of the opinion that the lessee, if in fact there has not been an abandonment, has failed to comply with the obligations imposed by the covenants of the lease, implied or expressed, to produce oil or gas in paying quantities. To constitute abandonment there must be a coincidence of act and intention, and the evidence adduced does not establish a definite intention to abandon. However, the evidence conclusively establishes that the lease has expired by reason of the failure of the lessee or its assignee to comply with the obligations imposed by the covenants of the lease."

In Adams v. Bennett, 282 S. W. (Tex. Civ. App.) 909, it appeared that there was a delay of production for eight months, under an oil and gas lease which provided:

"It is agreed that this lease shall remain in force for a term of three months from this date and as long thereafter as oil or gas, or either of them is produced from said land by the lessee, and as long as development work be in progress."

The trial court had adjudged cancellation of the lease. Affirming this judgment, the appellate court used the following language:

"The lease in question was executed on an entire section of land in May, 1922, the well in which the oil and gas was discovered was completed in February, 1924; this suit was filed on the 11th day of February, 1925, and the evidence is uncontradicted that between February, 1924, and November, 1924, there was nothing done toward developing the property.

"We do not hold that a temporary cessation of development or production will subject a lease contract to cancellation, but in a case such as this, where an entire section of land is involved, and nothing is done for a period of eight months in the way of development, we are of the opinion that the landowners are entitled to a cancellation."

It would seem evident, under these authorities and the legal principles they invoke, that the trial court in the case at bar, was fully warranted, under the evidence before it, in concluding that the agreements of the parties and the interests of the defendants in the lands affected thereby had been terminated by the unreasonable delay on the part of the latter in failing to continue production of oil therefrom and to develop them as agreed. There was a period of eight months allowed by defendants to elapse without doing anything at all either to produce oil from the wells on these lands, to increase their production, or to explore the territory additionally for minerals. It is true the defendants had been at quite considerable expense in putting down a well on the Southeast Quarter of the Northwest Quarter of said Section 7, yet the remaining forties of the Government leased tract, covered by the agreements of the parties, lay idle and untouched during the entire period, beginning with the execution of the agree-

ments to the time when the warning letter was sent to Walker by the plaintiff's socretary. No work of any kind appears to have been done in developing them. The same is true relative to the 40 acres of land held by plaintiff under the oil placer mining location. Inaction such as this on the part of the defendants was in disregard, not only of the plain provisions of the contracts by which they were bound, but the implied obligation arising from the nature of the engagements they assumed to perform.

It is urged that the district court erred in declining to receive proof that the United States Government had not found fault with the method or the extent to which the premises covered by the departmental lease aforesaid had been developed. We do not think so. Defendants, by their contracts with the plaintiff, definitely promised it, that they would perform the obligations imposed by the instruments through which plaintiff held its interest in the 160-acre tract. Even though it were a fact that the United States had consented in writing,—a plain requirement of the Government lease and something not attempted to be proven by the defendants,—to a release of the development requirements thereunder, still there existed the obligation, on the defendants' part toward the plaintiff, to develop the lands, an obligation which plaintiff could and did insist on defendants performing. From the letter of June 4, 1931, referred to above, it would rather appear that Government officials were complaining of the lack of production from the lease in question.

Our attention is directed to a letter of the Commissioner, of the General Land office of the United States Department of the Interior, recommending the issue of the formal lease on the 160-acre tract aforesaid, wherein it is stated that plaintiff is vested with

the legal title to the lease and that Hole and the two defendants, I. C. Covert and Walker, at that time, by reason of the agreements aforesaid with plaintiff, had equitable titles thereto. It is now said for defendants that this equitable interest should not be taken from them unless it is made clearly to appear that it would be against equity to permit them longer to assert such interest. We think, under the legal rules governing contracts of the character before us as indicated above, the district court correctly concluded that it would be inequitable for the defendants to longer retain an interest in the premises. Undoubtedly, that interest was held by them only under the terms of the operating agreements and was subject to be divested for a failure to comply therewith. It cannot be doubted that for many months it was utterly impossible for plaintiff to take action in developing the property itself or in securing others to do so, and in June, 1931, as the situation stood, nothing at all indicated that defendants intended to pursue the matter of developing the leased lands any further.

Considerable discussion is devoted by appellants' brief to a criticism of the reasons given in a letter written by the trial court, in directing the judgment below in plaintiff's favor. This letter is not, in fact, in the record. It could not properly be included therein and could not be given consideration here, if it were. Sewall v. McGovern, 29 Wyo. 62, 211 P. 96; Stevens v. Laub, 38 Wyo. 182, 265 P. 453. The controlling question here is—Did the district court err in entering the judgment it did upon the record before us for review? Being of the opinion that this question must be answered in the negative, the judgment appealed from will be affirmed.

*Affirmed.*

KIMBALL, C. J., and BLUME, J., concur.